## Commonwealth v. Wardrop

*Paul D. Shafer, District Attorney*, for Commonwealth.

*Douglas W. Ferguson*, for defendant.

THOMAS, *P. J.*, March 31, 1975—Defendant, James C. Wardrop, was indicted for murder by a grand jury on April 1, 1974. The murder is alleged to have occurred May 9, 1968. The victim of the alleged murder was one Phillip Earl Cownden whose body was found in French Creek in Crawford County about June 1, 1968.

Wardrop moved to suppress certain statements given to State police, the Attorney General and representatives of the Crime Commission because he had not been advised of his rights against self-incrimination in accord with the mandates of Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966), and its companion Pennsylvania cases. Wardrop also seeks to have statements made to an accomplice, William D. Snyder, suppressed on the "fruit of the poisonous tree doctrine" on the theory that Snyder was acting in cooperation with the State police in attempting to extract from him admissions of his involvement in the Cownden murder.

Wardrop also seeks to quash the indictment on the basis that he was denied a speedy trial.

The major thrust of Wardrop's attack on his murder indictment lies in his motion to quash the indictment and addresses itself to his contention that

he was promised and granted immunity under the Immunity Act of November 22, 1968, P.L. 1080, 19 P.S. §§640.1, et seq., in a proceeding before the Commonwealth Court of January 10, 1972.

It clearly appears from the reams of testimony taken in these pretrial hearings that the Pennsylvania Crime Commission was conducting an investigation of organized crime in western Pennsylvania and eastern Ohio as it related to a large conspiratorial burglary ring that was carrying out extensive burglary operations. Wardrop had been arrested and sentenced for one of these burglaries and sought the ear of law enforcement officials to "sing" and expose this conspiracy among thieves in return for immunity from further prosecution for his extensive involvement in the many crimes committed by this loosely organized group. Arrangements were made to have the Attorney General, members of his staff and State police interview Wardrop to ascertain whether he really had vital information on organized crime or whether he was just another fast-talking prisoner who was full of "hot air" and merely seeking a few days away from his prison cell and the self-satisfaction of "conning the experts." To make a long story short, Wardrop was a genuine "stool pigeon" and did have volumes of inside information on an extensive series of major burglaries. However, before the investigators could determine the genuineness of Wardrop's knowledge, it was necessary to have a bit of give and take conversation on the details of certain crimes — such details as only the police and the actual participants would know. In order to get information from Wardrop to "check out" the authenticity of his inside knowledge, the police admittedly did not give him the usual Miranda warnings. Obviously, a warning to Wardrop that anything he said

about his own involvement in these crimes would be used against him would promptly shut his mouth and thus destroy the "key" into the burglary ring. He was told by the Attorney General and State police that he would be granted immunity for whatever burglary crimes he admitted his involvement in, in return for his valuable "inside information." The State police investigators were aware that Cownden had been murdered and there was some evidence that somewhere in State police headquarters' files were reports that made Wardrop a likely suspect. During one of the interrogation sessions, when a series of burglaries Wardrop had been involved in and two murders were being discussed (referred to as the Scotchel and Krukar murders), a State police officer asked Wardrop what he knew about the Cownden murder. Wardrop said he did it but it was not a murder as he had shot Cownden in self-defense. It later developed that the Cownden murder (if it was a murder in view of Wardrop's claimed self-defense) occurred immediately after Cownden, Wardrop and others committed what was referred to as the Stockton burglary. Wardrop's version is that he and Cownden, riding in the back seat of the getaway car, got into some verbal argument and Cownden went for his gun but Wardrop was quicker and got him first. Cownden's body was dumped into French Creek as the car passed through Crawford County.

Eventually, the Attorney General arranged for proceedings under the aforesaid Immunity Act of 1968 to grant Wardrop immunity from prosecution. It is Wardrop's contention that he was promised and believed until the last minute that he was to get "total" immunity for all offenses he disclosed his involvement in, including the Cownden homicide. The Attorney General claims that the Cownden

homicide was excluded from the ultimate immunity grant.

The reasons why the Attorney General, Crime Commission and State police contend that the Cownden murder was not within the immunity promise is that they promised Wardrop immunity only from burglary prosecutions and that when he suddenly blurted out that he had killed Cownden, it came as a complete surprise to them and was not within the scope of their inquiry. Of course, Wardrop's position is that they were asking about his knowledge of burglaries and that the Cownden "self-defense" killing was committed in the process of the Stockton burglary. Further, that the questioning officer had just finished asking him what he knew about the Scotchel and Krukar murders and then asked about the Cownden murder. Wardrop's argument is that they could not promise him immunity for burglaries and then jump into murder questioning to trick him into making incriminating statements beyond the scope of the promised immunity grant.

The details of the conversational interplay between Wardrop, the Attorney General and a number of State police officers, the processing and details of the interviews, the appearances before the Crime Commission and ultimately before the Commonwealth Court would occupy dozens of pages. We see no need to explore that detail to reach the decision required here. Further, it is well known that indictments of obstructing justice and conspiring to obstruct justice have been returned by the grand jury against the former Attorney General and a ranking State police officer. Any detailed discussion of the particulars of their conduct and relationship with Wardrop or our observations on the propriety of the conduct of the parties involved could

conceivably jeopardize a fair trial for either or both the prosecution or defense.

Both at oral argument and in his written brief, the district attorney admits that if Wardrop was given valid immunity by the Commonwealth Court, it included immunity for the Cownden homicide. The district attorney and defense counsel both agree that the Immunity Act, 19 PS §640.1, grants "transactional immunity" as contrasted with "use immunity." Section 3 of said Act, 19 PS §640.3, provides:

"§ 640.3 Immunity

"No such witness shall be prosecuted or subjected to any penalty or forfeiture nor shall there be any liability on the part of and no cause of action of any nature shall arise against any such witness for or on account of any transaction, matter or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, nor shall testimony so compelled be used as evidence in any criminal proceeding against him in any court.": Act of Nov. 22, 1968, P.L. 1080, (No. 333) sec. 3.

Our Supreme Court in Riccobene Appeal, 439 Pa. 404, 412, 268 A. 2d 104 (1970), noted:

". . . The immunity [granted by this statute] relates to the *transactions, matters or things* concerning which testimony is compelled, not merely to the specific crimes which the Grand Jury was called to investigate. . . . [and includes] *any offense or crimes* disclosed by the compelled testimony."

The district attorney's brief argues that the immunity proceeding before the Commonwealth Court was a nullity and, therefore, Wardrop received no immunity. He argues that Wardrop had already given the Attorney General and State police

full details on his involvement in the lengthy series of crimes, including the Cownden homicide, and that the purpose of the Immunity Act is to compel persons to testify before investigating bodies who have refused to testify under the threat of a contempt sentence.

The district attorney argues that, while it is true that Wardrop was taken before the Crime Commission and refused to testify, this was merely a procedural sham in view of the fact Wardrop had already given pages of detailed information to the State police and Attorney General and that this "refusal to testify" was a contrived one solely for the purpose of getting Wardrop in a position to be granted immunity.[1] The Attorney General's position was that the grant of immunity did not cover the Cownden murder, but as noted previously, the district attorney's position is that if the immunity grant was legal, it did immunize Wardrop from prosecution for the Cownden homicide. The district attorney's argument is that Wardrop and the Attorney General did not comport with the letter or spirit of the Immunity Act in securing Wardrop a grant of transactional immunity and accordingly, this court should ignore the grant and refuse to quash the indictment.

We make no comment on the argument that the Attorney General's role in securing the immunity fell below law enforcement standards or smacked of impropriety. If indeed this is a partial basis for the pending charges against the former Attorney General and the State police officer, the airing of

---

1. Sections 640.1 and 640.3 of the act provide that in proceedings relating to organized crime or racketeering, if the person shall refuse to testify on the ground of self-incrimination, he may be ordered to testify once he is granted immunity by a court.

the details and the ramifications of this allegation will have to await exposure in a future legal proceeding.

We do find, however, that as sharp a professional criminal as Wardrop appears to be, we cannot attribute to him the role of a sophisticated legally knowledgeable schemer who agreed with others to manipulate the Crime Commission and the Commonwealth Court into an unwarranted or illegal grant of immunity for his crimes. Wardrop was not represented by counsel, he faced many years in jail on his present sentence and the possibility of a life of imprisonment if convicted of all the crimes which he actually committed. He saw a real opportunity to "turn state's witness" and lead the police to a number of unconvicted felons in return for a guarantee that he would not be prosecuted so he could see the possibility of release from prison in the foreseeable future. He was promised immunity, he cooperated and gave the information required and he was granted immunity. He was not sufficiently skilled in criminal procedure to make a determination (particularly without the benefit of counsel) that his grant of immunity might be attacked in the future. He wanted immunity, complied with his end of the bargain and was given immunity.

If the proceedings leading up to immunity and the grant thereof are ultimately to be found wanting in faithful law enforcement or acceptable procedure, we cannot lay these inadequacies at Wardrop's feet.[2]

What the district attorney is really asking this court to do is supersede and cancel the January 10,

2. We emphasize again that this statement should not be construed in any way as being this judge's opinion that the Attorney General and police fell below expected standards; this is a matter for future consideration.

1972, order of the Commonwealth Court granting Wardrop immunity. As noted in Commonwealth v. Russell, 225 Pa. Superior Ct. 133, 136, 137, 310 A. 2d 296 (1973), the Immunity Act contains no provision for challenging the validity of an order granting immunity.

". . . The general rule, however, is that only the person whose rights have been violated has standing to attack the validity of the action resulting in the violation. . . ." (See cases cited.)

We conclude that defendant was granted immunity from prosecution for this crime in return for his testimony involving himself and others in a lengthy series of felonies. We refuse to set aside the immunity order granted by the Commonwealth Court and find as a fact that said order covered the crime of murder here charged. We have no alternative but to quash the indictment.

Having sustained the immunity grant, we also find that all statements given by defendant before the official grant of immunity and elicited in the petition to suppress were given without appropriate Miranda warnings and upon a promise that the same would be covered by a future court immunity grant. The same will be suppressed.

The statements allegedly made to William C. Snyder, having been made after the official grant of immunity, are covered by said grant and will be suppressed.

We find no basis to quash the indictment on the basis of a denial of a speedy trial.

## ORDER

And now, March 31, 1975, for reasons set forth in this opinion, the indictment is quashed and statements of defendant are suppressed.

Defendant, having been confined in the Crawford County Jail during these proceedings, will be returned promptly to the State Correctional Institution at Dallas to serve the balance of the ten to 20 years burglary sentence imposed in Blair County.